919 So.2d 172 (2005)
Fred DILLON, Appellant,
v.
GREENBRIAR DIGGING SERVICE, LTD. PS, Appellee.
No. 2004-CA-00397-COA.
Court of Appeals of Mississippi.
June 7, 2005.
*174 Jack G. Price, McComb, attorney for appellant.
Donald Alan Windham, Richard F. Yarborough, Jackson, attorneys for appellee.
EN BANC.
CHANDLER, J., for the Court.
¶ 1. Fred Dillon filed a complaint against Greenbriar Digging alleging negligence when one of Dillon's horses was found dead near a trench dug by Greenbriar. Dillon filed suit against Greenbriar when it refused to compensate Dillon for the value of his horse. After a trial, the jury entered a verdict in favor of Greenbriar. The Walthall County Circuit Court denied Dillon's request for a judgment notwithstanding the verdict. Dillon appeals, raising the following issues, which we quote verbatim from his brief:

I. THE TRIAL COURT ERRED IN ALLOWING VICTOR PLOATTSKI TO TESTIFY ABOUT A DAILY PROGRESS SHEET OF WHICH HE HAD NO PERSONAL KNOWLEDGE:

II. THE VERDICT OF THE JURY IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND CONTRARY TO THE LAW

III. THE VERDICT OF THE JURY IS CONTRARY TO THE PHYSICAL FACTS AND THE EVIDENCE PRESENTED IN THE CASE

IV. IN CONSIDERING ALL OF THE EVIDENCE PRESENTED IN THIS ACTION IN THE LIGHT AND WITH ALL REASONABLE INFERENCES FAVORABLE TO GREENBRIAR, THE EVIDENCE AND INFERENCES ARE STILL SO STRONGLY AND OVERWHELMING IN FAVOR OF FRED DILLON THAT REASONABLE MEN, UNAFFECTED BY BIAS, PASSION AND PREJUDICE, COULD ONLY ARRIVE AT A VERDICT IN FAVOR OF THE PLAINTIFF, FRED DILLON

V. THE JURY INSTRUCTION MARKED D-5 SHOULD NEVER HAVE BEEN ADMITTED INTO COURT PROCEEDINGS
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. Lexie Water Association upgraded its water system for its customers residing in Walthall County. It contracted with Greenbriar Digging Services, Ltd. to dig the trenches. Fred Dillon agreed to give the Lexie Water Association and its contractors an easement to lay pipe across his property. The trench across Dillon's property was dug in late November of 2001, with the normal procedure of leaving a berm of dirt along the top of the trench *175 to take account of any dirt settling over time and returning to recover the berm in the passage of time. Dillon owned several horses, and he was warned to keep his livestock away from the trench during this period.
¶ 4. In March of 2002, Dillon found one of his horses dead. The horse was found in a boggy area near the location of the trench. When Dillon discovered the horse, the carcass had a strong odor and showed signs of significant decay, demonstrating that it had been in the trench for many days. Lexie made arrangements to bury the horse. Dillon contacted Greenbriar about the incident, and Greenbriar denied all liability. Dillon sued Greenbriar, alleging that its negligence in digging the trench resulted in the death of his horse. The jury returned a verdict in favor of Greenbriar. The circuit court judge denied Dillon's motion for judgment notwithstanding the verdict.

I. WHETHER THE TRIAL COURT ERRED IN ALLOWING VICTOR PLOATTSKI TO TESTIFY ABOUT A DAILY PROGRESS SHEET OF WHICH HE HAD NO PERSONAL KNOWLEDGE
¶ 5. As part of its defense, Greenbriar introduced an inspection report that was prepared by Lexie. Lexie's inspection reports are prepared daily by the inspector on duty. The report addresses the activities performed that day and the inspector's impressions of them.
¶ 6. Victor Ploattski was an inspector for Lexie. He testified as to Lexie's inspection report that the company prepared after performing its work on Dillon's property. The report was admitted into evidence over the objection of Dillon's counsel. Dillon claims that the inspection report was hearsay because Ploattski was not the inspector on the job the day Lexie performed the work on Dillon's property.
¶ 7. Ploattski was testifying as to records of a regularly conducted business activity. The report is therefore admissible under the business records exception to the hearsay rule. M.R.E. 803(6) defines a record of a regularly conducted business activity in the following way:
A memorandum, report, record or data compilation, in any form, or acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or self-authenticated pursuant to Rule 902(11), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
¶ 8. The foundational requirements for admitting evidence under the business records exception are: 1) the statement is in written or recorded form; 2) the record concerns acts, events, conditions, opinions or diagnoses; 3) the record was made at or near the time of the matter recorded; 4) the source of the information had personal knowledge of the matter; 5) the record was kept in the course of regular business activity; and 6) it was the regular practice of the business activity to make the record. Flowers v. State, 773 So.2d 309, 322(¶ 72) (Miss.2000).
¶ 9. In establishing the foundational requirements to establish the reliability of the inspection report, the following questioning occurred:
Q (By Greenbriar's Counsel): And you served as an inspector on this particular job.
A (By Victor Ploattski): Yes, sir.

*176 Q: What, and you're employed with the water association?
A: Yes, sir.
Q: And what are you inspecting?
A: Well, I was informed I inspected the depth of the trench. I kept records, as a daily report. I drew diagrams so that it could be made into print, to where they could no where the water lines were run. And I was just, being from Lexie, I was just looking after their behalf.
Q: Now, let me ask you what type of reporting is done in conjunction with inspection on a project. Do you generate any type of reports or paperwork?
A: Your daily inspection.
Q: Okay. And is that a, do you have some type of form?
A: Yes, sir,
Q: That's provided by the
A: Provided by Lexie Water that we filled daily.
Q: These reports, are they routinely and regularly prepared in connection with any type project that the water association
A: They were done daily.
Q: And are you familiar with the form of that report?
A: Yes, sir.
Q: (Showing the inspection report): Do you recognize that to be the form that you would have used had you been the inspector on the job that day?
A: Yes, sir.
Q: Who was the inspector on this particular job?
A: On this particular paper it says Robert VanDan.
Q: And who is Mr. VanDan?
A: He's the one that employed me.
Q: Do you recognize this to be his writing on the report?
A: Yes, sir.
¶ 10. Greenbriar's counsel established all the foundational requirements necessary to admit the inspection report under the business records exception to the hearsay rule. The inspection report was one that was kept daily on the same form prepared by the inspector that was working that day. Ploattski was competent to testify about the inspection report because he worked for Lexie as an inspector and regularly kept similar records on the same form. In Flowers, the supreme court held that a person who is familiar with the contents, terms, and meaning of a form is competent to give testimony regarding the foundational requirements of the business record exception. Id. at 332-33(¶ 77). The circuit court judge was within his discretion in admitting the inspection report.

II. WHETHER THE VERDICT OF THE JURY IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND CONTRARY TO THE LAW

III. WHETHER THE VERDICT OF THE JURY IS CONTRARY TO THE PHYSICAL FACTS AND THE EVIDENCE PRESENTED IN THE CASE

IV. WHETHER, IN CONSIDERING ALL OF THE EVIDENCE PRESENTED IN THIS ACTION IN THE LIGHT AND WITH ALL REASONABLE INFERENCES FAVORABLE TO GREENBRIAR, THE EVIDENCE AND INFERENCES ARE STILL SO STRONGLY AND OVERWHELMING IN FAVOR OF FRED DILLON THAT REASONABLE MEN, UNAFFECTED BY BIAS, PASSION AND PREJUDICE, COULD ONLY ARRIVE AT A VERDICT IN FAVOR OF THE PLAINTIFF, FRED DILLON
*177 ¶ 11. Dillon's suit against Greenbriar alleged that Greenbriar was negligent in failing to fully fill in the trench. "To prevail on a claim for negligence, the plaintiff must establish by a preponderance of the evidence each of the elements of negligence: duty, breach, causation and injury." Lovett v. Bradford, 676 So.2d 893, 896 (Miss.1996). Negligence is defined as "failure to exercise reasonable care under the circumstances." Smith v. City of West Point, 475 So.2d 816, 818 (Miss.1985) (overruled on other grounds) (citing Cole v. Delchamps, Inc., 246 Miss. 846, 852, 152 So.2d 911, 913 (1963)).
¶ 12. To succeed in a negligence claim, the plaintiff must prove both causation and proximate cause. This requirement means that a defendant is not liable "for damages which are remote or collateral, or which result from a remote, improbable or extraordinary occurrence, although such occurrence is within the range of possibilities flowing from Defendant's negligent act." Ware v. State, 790 So.2d 201, 214(¶ 48) (Miss.Ct.App.2001).
¶ 13. When reviewing the denial of a judgment notwithstanding the verdict, this Court will "consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence." Sperry-New Holland v. Prestage, 617 So.2d 248, 252 (Miss.1993). "[I]f there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required." McMillan v. King, 557 So.2d 519, 522 (Miss.1990). This Court must affirm the circuit court's denial of a judgment notwithstanding the verdict if there is "evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions." Alabama Great Southern R.R. Co. v. Lee, 826 So.2d 1232, 1236(¶ 12) (Miss.2002).
¶ 14. For Dillon to succeed in his claim, he was required to show that Greenbriar breached its duty of care and that this breach of care proximately caused the death of his horse. There is substantial evidence both that Greenbriar exercised reasonable care in digging the trench and that the injury was a remote occurrence. The testimony of Chris Case, the superintendent for Greenbriar, allows a jury to question Dillon's assertions that the trench was the cause of the accident. Case examined the trench in the area where the horse was found. He said, "It was fresh dirt in a spot. As far as the trench leading back to the wooded area where the horse was supposed to have been found, it was sunk just a little. I saw two to three, four inch[es] sunk [sic], where it had rained. Nothing that you would lose a horse in."
¶ 15. Case testified as to the digging and filling procedures Greenbriar uses when they dig their trenches. When the land is occupied by cattle or horses, the person filling the trench will "try to pack it a little better with a bulldozer, run a track on it after we put the dirt in the hole, after it's back filled. That's the normal procedure." The trench is filled immediately after the pipe is laid. Greenbriar used this procedure on Dillon's property. After Greenbriar finished work on Dillon's property, it left a berm of dirt over the trench. This procedure is performed so that the dirt will sink into the trench when it rains. After the first rain, Greenbriar sends a representative to the owner's property to refill the trench. The representative continues to return to the owner's property after each rain until the ground is firm. *178 This procedure was used when filling the trench on Dillon's property.
¶ 16. Ploattski, who came to Dillon's property after Dillon's horse was discovered, corroborated much of Case's testimony. Ploattski testified that "the trench had been filled, but there were some low spots or settling. Nothing that you could look down and see the pipe, but there were some places that had settled somewhat." He testified that the horse was found close to the filled-up trench, but the horse was not actually in the trench. As one of Lexie's inspectors, he observed and supervised the workers who filled in the trenches after the rains. Ploattski testified that, "other than putting an asphalt cap or concrete down over the trench that was dug . . . in that low area," there were no other procedures Greenbriar could have used to make the ground more firm.
¶ 17. Dillon argues that the jury verdict is against the overwhelming weight of the evidence under the principle of res ipsa loquitur. He alleges that Greenbriar should be held liable because the horse would not have died except for the presence of the trench. This argument is misplaced. Res ipsa loquitur can apply only when the instrument of the event is in the sole control of the defendant. See e.g. Phillips v. Illinois Cent. R.R. Co., 797 So.2d 231, 236(¶ 9) (Miss.Ct.App.2000). In the present case, the trench was under the control of Dillon, Lexie Water Association, and Greenbriar. Second, the injury must be such that in the ordinary course of events it would not occur if the defendant used proper care. Winters v. Wright, 869 So.2d 357, 363(¶ 13) (Miss.2003).
¶ 18. The jury was presented with substantial credible evidence showing that Greenbriar used reasonable care in filling Dillon's trench, and there is also substantial evidence to raise doubts in a reasonable juror's mind as to whether the trench caused the accident. We affirm the jury's verdict.

V. WHETHER THE JURY INSTRUCTION MARKED D-5 SHOULD HAVE BEEN ADMITTED INTO COURT PROCEEDINGS
¶ 19. Greenbriar's jury instruction D-5 pertained to the issue of proximate cause. The instruction reads:
You are instructed that Greenbriar Digging is not liable on the plaintiff's claim in this case if you find that the death of the horse resulted from a remote, improbable or extraordinary occurrence, although such occurrence is within the range of possibilities, flowing from Greenbriar's installation of the community waterline on plaintiff's property.
¶ 20. Instruction D-5 correctly states the law of Mississippi regarding proximate cause. Instruction D-5 recites the language from one of the Mississippi Model Jury Instructions. See Miss. Prac. Model Jury Instr. Civil § 15:2. "[T]he defendant is not liable for damages which are remote or collateral, or which result from a remote, improbable, or extraordinary occurrence, although such occurrence is within the range of possibilities flowing from defendant's negligent act."
¶ 21. In determining whether the circuit court erred in granting or refusing certain jury instructions, this Court reads all the instructions actually given as a whole. If the instructions fairly announce the law of the case and create no injustice, no reversible error is found. Coleman v. State, 697 So.2d 777, 782 (Miss. 1997); Collins v. State, 691 So.2d 918, 922 (Miss.1997). Proximate cause is a necessary element a plaintiff must prove in establishing negligence. "Remote possibilities do not constitute negligence from a judicial standpoint." Foster by Foster v. Bass, 575 So.2d 967, 974 (Miss.1990) (citing *179 Illinois Central R.R. Co. v. Bloodworth, 166 Miss. 602, 145 So. 333, 336 (1933)). For a person to be found negligent, and therefore liable, he should have reasonably anticipated that an injury would have resulted from his action. He is "not bound to a prevision or anticipation which would include an unusual, improbable, or extraordinary occurrence, although such happening is within the range of possibilities." Mauney v. Gulf Refining Co., 193 Miss. 421, 9 So.2d 780, 781 (1942).
¶ 22. The court can take a legally correct jury instruction from the jury only when "taking the evidence in the light most favorable to the party requesting the instruction, and considering all reasonable favorable inferences which may be drawn from the evidence in favor of the requesting party, that no hypothetical, reasonable jury could find the facts in accordance with the theory of the requested instruction." Busick v. St. John, 856 So.2d 304, 311 (¶ 17) (Miss.2003) (citing Church v. Massey, 697 So.2d 407, 410 (Miss.1997); Hill v. Dunaway, 487 So.2d 807, 809 (Miss.1986)). Dillon's objection to the proposed jury instruction was, "I don't think it [the cause of the horse's death] would be a remote, improbable, or extraordinary occurrence given the fact that the horses were in the field." This objection is reiterated in his brief. Dillon, in effect, is arguing that the facts of the case do not support the jury instruction.
¶ 23. The facts show that a reasonable jury could have found that the cause of the horse's death resulted from a remote, improbable, or extraordinary occurrence that was, at most, tangentially related to the negligence of Greenbriar. The condition of the horse when Dillon discovered it calls into question whether the horse actually died through Greenbriar's failure to fill in the trench. The horse was decomposed and decayed when Dillon found it, and it appeared to have been dead for quite some time. With the horse in such an advanced stage of decomposition, the exact cause of the horse's death would have been difficult if not impossible to determine. The injury to the horse occurred several months after Greenbriar dug the trench, allowing the jury to infer that if the injury was caused by the trench, it was a remote occurrence. Dillon himself admitted that he did not know the cause of his horse's death. He testified, "God only knows what killed it, but I figure it broke its legs and bled to death when it flipped, you know." There was no error in allowing the jury to consider whether the death of Dillon's horse was the result of a remote, improbable, or extraordinary occurrence.
¶ 24. THE JUDGMENT OF THE CIRCUIT COURT OF WALTHALL COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, GRIFFIS, AND ISHEE, JJ., CONCUR. BARNES, J., NOT PARTICIPATING.